In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-1864

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROHI ISRAEL f/k/a JARVIS JEFFERSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:95-CR-25—**William C. Lee**, *Chief Judge.*

ARGUED SEPTEMBER 26, 2002—DECIDED JANUARY 30, 2003

Before COFFEY, ROVNER, and DIANE P. WOOD, *Circuit Judges.*

COFFEY, *Circuit Judge.* Defendant-Appellant Jarvis Jefferson, now known as Rohi Israel ("Israel"), is a felon who admits smoking marijuana "every day all day." He appeals the revocation of his supervised release, arguing that his frequent marijuana use should be permitted as it is based upon his religious belief in Rastafarianism. We affirm.

## I. FACTUAL BACKGROUND

In January 1996, Israel was sentenced to seventy months in prison after entering a plea of guilty to being a con-

victed felon in possession of a firearm. While in confinement, he participated in a substance abuse treatment program. Furthermore, while incarcerated he decided to join the Rastafarian religion, which encourages its adherents to smoke marijuana.

On February 15, 2001, Israel completed his term of imprisonment and began his three-year term of supervised release. The "Standard Conditions of Supervised Release" with which Israel was to comply required him to "refrain from the excessive use of alcohol," and forbade him from "purchas[ing], possess[ing], us[ing], distribut[ing], or administ[ering] any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician." Israel was also obliged to submit to random urinalysis tests.

At a scheduled probation revocation hearing on October 25, 2001, U.S. Probation and Pretrial Services Officer Ned Edington, Israel's parole officer, testified that Israel had tested positive for marijuana over a dozen times between April and October of 2001. Edington stated that several of these tests established levels indicative of "very serious" and "abusive usage." At the hearing, although Israel's attorney acknowledged that the test results were positive, he refused to stipulate that the tests accurately reflected the *level* of Israel's drug use. Israel also acknowledged that he was aware of the fact that smoking marijuana was in violation of the terms of his supervised release.

On December 12, 2001, the district court entered a Memorandum of Decision and Order finding that Israel had violated the terms and conditions of his supervised release by testing positive for marijuana; he was subsequently sentenced to eleven months in prison. The district court stayed the execution of his sentence pending the outcome of this appeal. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II.  DISCUSSION

Israel argues that the district court's revocation of his supervised release violated his right, as a practicing Rastafarian, to the free exercise of his religion under the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(a), ("RFRA").

## A.  Standard of Review

Where First Amendment concerns are at issue, appellate courts must conduct an "'independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 284-86 (1964)). As this appeal demands an analysis of constitutional issues and not factual disputes, the standard of review is *de novo*. *See Sequoia Books, Inc. v. Ingemunson*, 901 F.2d 630, 633 (7th Cir. 1990).

## B.  Free Exercise Clause

In *Employment Division v. Smith*, 494 U.S. 872 (1990), the Supreme Court held that neutral laws of general applicability that have the effect of burdening religious practices do not violate the Free Exercise Clause. 494 U.S. at 883. The parties here do not dispute that laws against drug use and laws concerning supervised release programs are of general application, nor do they disagree that these laws had the effect of burdening Israel's free exercise of his religious beliefs. Thus, if Israel is to prevail in his claim that the revocation of his parole violated the free exercise of his religion, he must do so on the basis of his claims under RFRA. *See United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 629 (7th Cir. 2000), *cert. denied*, 531 U.S. 1112 (2001).

## C.  RFRA

Under RFRA, a "person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). RFRA provides that the government "shall not substantially burden a person's exercise of religion even if the burden results from *a rule of general applicability*" unless the government demonstrates that application of the burden to the person "(1) *is in furtherance of a compelling governmental interest*; and (2) *is the least restrictive means of furthering that compelling governmental interest*." 42 U.S.C. § 2000bb-1 (emphasis supplied). The statute itself recited that its purpose was to "*restore the compelling interest test* as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and to guarantee its application in all cases where free exercise of religion has been substantially burdened." 42 U.S.C. § 2000bb(b)(1) (emphasis supplied).

In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court struck down RFRA's application to the states, but left open the possibility that RFRA still applied to the federal government. *See* 521 U.S. at 516. At least two other circuit courts of appeal have held that RFRA still applies to the federal government. *See Kikumura v. Hurley*, 242 F.3d 950, 953 (10th Cir. 2001) (holding that a plaintiff had a "substantial likelihood" of success in proving that a prison warden's denial of a pastoral visit violated RFRA); *Christians v. Crystal Evangelical Free Church (In re Young)*, 141 F.3d 854, 856 (8th Cir. 1998) (ruling that RFRA prevents the recovery of a debtor's religious tithes as "avoidable transactions" in bankruptcy proceedings). We must make clear that this conclusion is not universal, however. *See, e.g., La Voz Radio de la Communidad v. FCC*, 223 F.3d 313, 319 (6th Cir. 2000)

(expressing "doubt" that RFRA is still constitutional as applied to federal law).

This Court recently held that while RFRA's constitutionality as applied to the federal government was "not without doubt," it would "assume [RFRA] is constitutional" when the parties chose not to dispute its constitutionality. *See Indianapolis Baptist Temple*, 224 F.3d at 629 n.1. The trial court in this case found that RFRA, at least as it applied to the federal government, was constitutional. As the government did not contest RFRA's constitutionality, we will likewise assume in this case only that it is constitutional for the purposes of this appeal.

The district court's decision noted that under RFRA, a plaintiff establishes a *prima facie* violation if he can demonstrate that the government's action was a (1) substantial burden on a (2) sincere (3) exercise of religion. Having done so, the court explained that the burden shifted to the government to prove that it had a compelling interest that the statute protected by the least restrictive means possible.

The district court found for Israel on the first and second issues; *i.e.*, that the supervised release condition was a substantial burden on Israel's sincere belief. As the government had stipulated on the third issue; *i.e.*, that Israel was engaged in the exercise of a religious belief, the sole issue on appeal is whether the district court erred in ruling that the government had established that it had a compelling interest that was protected by the least restrictive means possible.

The district court found that the government demonstrated its compelling interest in (1) the uniform enforcement of drug laws to prevent harm to the public health and safety, and (2) the uniform application of conditions of supervised release to all defendants. The court also found that the parole conditions were the least restric-

tive means for accomplishing these objectives because of the "significant administrative problems" that would result if religious exceptions would be carved out in these types of cases. The court rejected Israel's invitation to rely on *United States v. Valrey*, 2000 WL 692647 (W.D. Wa. Feb. 22, 2000), in which a federal district court in Washington state modified the terms of supervised release for a Rastafarian parolee who had tested positive for marijuana use, allowing for such use within certain limits.[1]

Whether the government has a compelling interest in preventing drug abuse can hardly be disputed. In enacting the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq*., Congress stated that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2). Congress' inclusion of marijuana as a Schedule I controlled substance makes it clear the belief that Israel's drug of choice is a serious threat to the public health and safety. *See also National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 674 (1989) (calling drug abuse "one of the most serious problems confronting our society today"). Furthermore, there is ample medical evidence establishing the fact that the excessive use of marijuana often times leads to the use of stronger drugs such as heroin and crack cocaine. *See*, *e.g.*, Fernando A. Wagner & James C. Anthony, *Into the World of Illegal Drug Use: Exposure Opportunity and Other Mechanisms Linking the Use of Alcohol, Tobacco, Marijuana, and Cocaine*, 155 Am. J. Epidemiology 1 (2002).

Before the United States Supreme Court decision in *Smith*, courts had to apply the "compelling interest" test

---

[1] This Court wishes to remind Israel's counsel that pursuant to Circuit Rule 53, unpublished cases shall not be cited or used as precedent.

when applying drug laws against religious objections. There is substantial authority to support the conclusion that even under this more demanding standard, courts have properly refused to allow exceptions for marijuana use. *See, e.g., Olsen v. DEA*, 878 F.2d 1458, 1460-63 (D.C. Cir. 1989) (allowing regulation of "sacramental" marijuana use by Ethiopian Zion Church because of the government's "compelling interest"); *United States v. Middleton*, 690 F.2d 820, 823 (11th Cir. 1982) (same); *United States v. Rush*, 738 F.2d 497, 513 (1st Cir. 1984) ("Every federal court that has considered the matter . . . has accepted the congressional determination that marijuana in fact poses a real threat to individual health and social welfare, and has upheld the criminal sanctions for possession and distribution of marijuana even where such sanctions infringe on the free exercise of religion.").

In light of this impressive amount of legislative and judicial reasoning, we conclude that the government has a proper and compelling interest in forbidding the use of marijuana. Furthermore, demanding that a convicted felon on parole abstain from marijuana use is a legitimately restrictive means for safeguarding this interest. Any judicial attempt to carve out a religious exemption in this situation would lead to significant administrative problems for the probation office and open the door to a weed-like proliferation of claims for religious exemptions. *See United States v. Oliver*, 255 F.3d 588, 589 (8th Cir. 2001) (rejecting a RFRA-based argument for a judicial exception to a criminal statute). Furthermore, permitting probationers to smoke pot presents a potential liability problem for the public and the government, including the probation department—*e.g.*, a person on parole who is under the influence of marijuana may wander into the street or even operate a motor vehicle or some other mechanical equipment and may very well injure himself or some innocent bystander. *See, e.g., Weissich v. United*

*States*, 4 F.3d 810, 812-13 (9th Cir. 1993) (holding that a probation officer was not liable for the acts of a probationer, provided the Federal Tort Claims Act "discretionary function" exception applied to the specific conduct in question). We therefore affirm the district court's decision to revoke Israel's supervised release.

We note in passing—not that we need to hash out another justification in full—that we could have affirmed the district court's decision on other grounds. As the judge noted, Israel violated at least two other conditions of his parole; namely, to support his dependent son and to keep a job. Condition number four of his supervised release obligates him to "support his . . . dependents and meet other family responsibilities." Condition number five states that Israel "shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons."

At the October 25, 2001 hearing on the government's petition to revoke Israel's supervised release, Israel admitted to violating both of these conditions. The hearing transcript contains the following exchange between Israel and the assistant U.S. attorney:

> Q: Now, you say that you smoke all day every day to give praise to God. What about your responsibilities with respect to the world. You have a child, don't you?
>
> A: To the world?
>
> Q: Yeah, the world in which you live in?
>
> A: Okay. It is respect to the world.
>
> Q: You have a child?
>
> A: That's right.
>
> Q: And you owe child support to that child, right?
>
> A: That's right.

Q:  And you're not working right now, are you?

A:  That's right.

Q:  Now, you talked about people growing marijuana. Do you grow marijuana?

A:  Do I grow marijuana?

Q:  Mmm-mm. Are you growing it now?

A:  No.

. . .

Q:  You're going to have to buy it, aren't you?

A:  Uncle Sam going to tax, yeah, he going to get his cut, yeah.

Q:  So you buy it from people on the street?

A:  That's right. Yeah.

Q:  Now, where do you get the money to buy the marijuana if you're not working?

. . .

A:  How do you know that I don't work?

Q:  You said you don't work.

A:  I might not work according to your all system. You don't know what that mean? I might have my own detail shop, I might go work for somebody or something.

Q:  So you are working and finding ways to make money?

A:  Ahh, Rastafar right. You know I can't go and get no job, me smoking herbs and all that, right? Rastafar right. Hmmm.

(10/25/01 Hearing Tr. at 52.)

This exchange demonstrates that Israel breached his obligation to provide for his minor son and hold a job; it

also reveals two more violations stemming directly from Israel's marijuana habit; namely, the general condition that he "shall not commit another federal, state or local crime" and, under condition number nine, that he "not associate with any persons engaged in criminal activity. . . ." By admitting he (somehow) illegally purchased the marijuana he was smoking "every day all day," Israel implicitly acknowledged he was encouraging third parties to engage in criminal activity, thus perpetuating the distribution of unlawful narcotics. This not only strengthens the government's case that it has a "compelling interest" in forbidding Israel's pot-smoking; it proves beyond a doubt that Israel has violated the conditions of his supervised release.

## III.  CONCLUSION

The decision to grant the government's petition to revoke Israel's supervised release is hereby AFFIRMED.

A true Copy:

      Teste:

                              _____

                              *Clerk of the United States Court of*
                                   *Appeals for the Seventh Circuit*